**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00248-CR**
_____

**PAUL FRANK WARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-10-13015-CR**

**MEMORANDUM OPINION**

In an open plea agreement, Paul Frank Ward (Ward or Appellant) pleaded guilty to the second-degree felony offense of sexual assault of his adult daughter, L.H.[1] *See* Tex. Penal Code Ann. § 22.011(a)(1)(A), (f). After conducting a sentencing hearing, the trial court assessed Ward's punishment at fifteen years of

_____

[1] To protect the privacy of the victim, we refer to her by her initials. *See* Tex. Const. art. I, § 30(a)(1) (granting victims of crime "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

confinement. *See id.* § 12.33. On appeal, Ward raises two issues related to the punishment imposed by the trial court. We affirm the trial court's judgment.

Punishment Evidence

L.H. testified that she first met Ward, her father, when she was fifteen years old and began establishing a relationship with him. He would provide marijuana, alcohol, and Xanax to her and a friend, and Ward would drink and use drugs with them when L.H. would stay with him. At that time, she was fifteen and sixteen years old.

According to L.H., in September 2014, when she was twenty-five years old, she went to Ward's house, and Ward suggested they play a drinking game with liquor. L.H. testified that the next thing she knew she woke up naked and he was sexually assaulting her. She knew she needed to get away, so she punched him, put her clothes on, and ran away from the house. A neighbor saw her running down the street crying and called 911 for her, and L.H. told the police what had happened. She was taken to a hospital and had a rape kit examination at the hospital. L.H. testified that Ward's sexual assault of her devastated her, that she was "inconsolable for a long time[,]" missed several days of work, and would not speak to her mother or leave her apartment. L.H. testified that later when the investigation was not progressing as quickly as she wanted, she moved far away to another state because Ward was not in jail and she was afraid of him. After four months in another state,

2

she became homeless and did not know anyone in that state, so she lived in a van to avoid coming back to Texas where Ward was "walking free[]" and could find her. When asked how the sexual assault has affected her, L.H. agreed that she will have to deal with it the rest of her life, and she testified as follows:

> I have been depressed for a long time. . . . I do not trust people. I trusted him very much. He was very protective. He was my protector, my parent. I trusted him and he did that. He raped me. . . . I know what people are capable of. People that you trust, I don't trust people. I have had many nightmares of Paul. It affects my sleep. . . . I have nightmares. I have lots of trouble being intimate with people. My partner, not people, lots of trouble with that. I push people away. I don't trust people. It's affected me greatly.

When asked about the potential impact of Ward's cancer diagnosis on the case, L.H. responded, "[a]ny man who puts his penis inside of his unconscious daughter does not deserve to have cancer considered in my opinion. It's irrelevant."

Sergeant Jody Armstrong with the Montgomery County Sheriff's Office testified that she was assigned to investigate the sexual assault and when she spoke with Ward, he did not deny sexually assaulting L.H. but instead said he could not remember if he and L.H. had touched each other. Sergeant Armstrong testified that over a year after charges were filed in the case, she received the crime lab report from DNA testing on the rape kit from the case, and the testing was positive for semen in areas around L.H.'s vagina, anus, and breasts. According to Armstrong, subsequent testing of Ward's buccal swabs "showed that on some of the swabs that

3

it was . . . 4.5 an upwards quintillion chance that the semen that was swabbed from [L.H.] was Paul Ward's."

Dr. Mohsha Arani testified that he has been Ward's oncologist for more than four years and since January 2015. According to Dr. Arani, Ward was diagnosed with "nonresponsive lung cancer, adenocarcinoma Stage 4 with metastasis to the brain." Dr. Arani testified that Ward's cancer had spread from his lung to the lymph nodes, bone, liver, and brain and therefore is "pretty much [a] deadly disease[]" because treatment is difficult as "chemicals don't penetrate the brain very, very well." According to Dr. Arani, with normal treatment for Ward's diagnosis, "the literature[]" says Ward's life expectancy would be six to nine months.

Dr. Arani testified that in 2015 Ward received a combination of chemotherapy but it had to be stopped due to deadly "complications with wound infections and not healing[]" caused by the chemotherapy. Ward agreed to a new treatment option, Opdivo, that Ward began taking the last part of 2015 and for the last four years. Dr. Arani testified that the drug is now FDA approved, available, and can be administered through infusion at any oncologist's office. According to Dr. Arani, the effectiveness of the drug in treating Ward's cancer had been "incredible[]" as Ward is the longest living patient Dr. Arani has had with this type of cancer, and the drug has not only stopped his cancer from getting worse but has "actually regress[ed] a lot of the tumor, especially the brain one." Dr. Arani testified that if the Opdivo

4

treatment were to be discontinued, "the cancer will start doing what it wanted to do four years ago[]" and Ward's cancer would not stay in remission.

Richard Lewis Ward, Appellant's nephew, testified that he works at the correctional care wing of the Huntsville Memorial Hospital, and he has worked for TDCJ at different units and in different capacities for sixteen years. According to Appellant's nephew, TDCJ inmates are treated by physicians that work for the prison system and do their own evaluation and decide treatment, and although he does not handle insurance for the inmates, it is his understanding that the inmates are insured under TDCJ regardless of the private insurance that they had prior to their incarceration. Appellant's nephew testified that he has witnessed sick inmates' conditions decline in prison because of the conditions and that there is no guarantee that an inmate would receive the same kind of treatment that they received prior to their incarceration. Appellant's nephew agreed that he is aware that Appellant has stage four cancer, that he has to receive treatment every two weeks, and that the treatment is a new and expensive drug.

The pre-sentence investigation report for Ward was also admitted into evidence. According to the report, Ward's criminal history included a felony offense of "Driving While Intoxicated 3rd or More" in 2016, which was after he sexually assaulted L.H.

Excessive Punishment

In his first issue, Ward argues that he should be granted a new punishment hearing because his sentence of fifteen years for sexual assault constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution, Article I, Section 13 of the Texas Constitution, and Article 1.09 of the Texas Code of Criminal Procedure, because his sentence is grossly disproportionate to the offense committed.[2] *See* U.S. Const. Amend. VIII; Tex. Const. art. I, § 13; Tex. Code Crim. Proc. Ann. art. 1.09. According to Ward, although the gravity of the offense to which he pleaded guilty is "very serious in the harm to [L.H.]" and Ward has three prior convictions for driving while intoxicated, his treating oncologist "testified at the punishment hearing that confinement in the Texas Department of Criminal Justice is effectively a death sentence because Appellant has been diagnosed with cancer and if left untreated, will cause Appellant's death."

In reviewing a trial court's sentencing determination, we afford the trial court "a great deal of discretion[.]" *See Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). The Eighth Amendment to the United State Constitution provides that

---

[2] Ward does not argue that the cruel and unusual provisions of the state constitution or the statute are broader and offer greater protection than the Eighth Amendment. *See Baldridge v. State*, 77 S.W.3d 890, 894 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (where the appellant did not argue that provisions of the Texas Constitution offer more protection than the Eighth Amendment, the issue was not presented for review); *Puga v. State*, 916 S.W.2d 547, 550 (Tex. App.—San Antonio 1996, no pet.) (same).

"[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Generally, a sentence that is within the range of punishment established by the Legislature is not excessive, cruel, or unusual, and will not be disturbed on appeal. *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016); *Jackson*, 680 S.W.2d at 814. An appellate court rarely considers a punishment within the statutory range for the offense excessive, unconstitutionally cruel, or unusual under either Texas law or the United States Constitution. *See Kirk v. State*, 949 S.W.2d 769,772 (Tex. App.—Dallas 1997, pet. ref'd); *see also Jackson v. State*, 989 S.W.2d 842, 846 (Tex. App.—Texarkana 1999, no pet.). An exception to this general rule is recognized when the sentence is grossly disproportionate to the offense. *Solem v. Helm*, 463 U.S. 277, 289-90 (1983); *see also Harmelin v. Michigan*, 501 U.S. 957, 1004-05 (1991) (Kennedy, J., concurring). Except for cases involving capital punishment, a successful challenge to the proportionality of a particular sentence is exceedingly rare. *Solem*, 463 U.S. at 289-90.

To determine whether a sentence is grossly disproportionate to a particular defendant's crime, we consider (1) the severity of the offense in light of the harm caused or threatened to the victim; (2) the culpability of the defendant; and (3) the defendant's prior adjudicated and unadjudicated offenses. *Simpson*, 488 S.W.3d at 323. In the rare case in which this threshold comparison leads to an inference of

gross disproportionality, we then compare the defendant's sentence with the sentences of other offenders in Texas and with the sentences imposed for the same crime in other jurisdictions. *Id.* "If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual." *Id.*

Ward was convicted of sexual assault, a second-degree felony, and the statutory punishment range authorized by the Texas Legislature for such offense is imprisonment of "not more than 20 years or less than 2 years[]" and "a fine not to exceed $10,000." *See* Tex. Penal Code Ann. §§ 12.33, 22.011(f). Because Appellant's sentence fell within the statutory range, there is no reason to compare his sentence to sentences imposed on others. *See Simpson*, 488 S.W.3d at 323 (citing *Graham v. Florida*, 560 U.S. 48, 60 (2010); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992)). We conclude that Ward's sentence of fifteen years of confinement is not unconstitutionally excessive or cruel and unusual. *See Davis v. State*, 323 S.W.3d 190, 195-96 (Tex. App.—Dallas 2008, pet. ref'd) (where appellant asserted the penitentiary did not provide treatment for his medical condition and thereby made his term of imprisonment "effectively a death sentence[,]" his sentences were not excessive, cruel, or unusual, even if he had preserved error, because the punishment was within the range prescribed by the legislature). Additionally, having reviewed the records and considered the harm to Ward's victim, L.H., his

8

culpability, and his prior offenses, we cannot conclude that the case is one of those rare cases that leads to the inference that Ward's sentence was grossly disproportionate to the offense. *See Solem*, 436 U.S. at 289-90; *Simpson*, 488 S.W.3d at 323; *see also Nobles v. State*, No. 10-06-00153-CR, 2007 Tex. App. LEXIS 6101, at **1, 3-4 (Tex. App.—Waco Aug. 1, 2007, pet. ref'd) (mem. op., not designated for publication) (appellant suffering from Hodgkin's disease, cancer, anxiety, severe depression, and insomnia did not meet requirement of threshold determination that his fifty-year sentence for aggravated assault was grossly disproportionate to the crime). We overrule issue one.

Denial of Hearing on Motion for New Trial on Punishment

In his second issue, Ward argues that the trial court failed to hold a hearing on Appellant's motion for new trial on punishment. Ward timely filed a motion for new trial on punishment because his "sentence is disproportionate and therefore violates the prohibition against cruel and unusual punishment." The motion alleged "the following facts from the record and outside the record[:]"

> During Defendant's sentencing hearing, his oncologist, Dr. Moshen Arani testified that Defendant is currently diagnosed and receiving treatment for stage IV cancer. Dr. Arani also testified that Defendant receives treatment for his cancer through the administration of an immunotherapy drug called Opdivo. Defendant must receive this treatment every two weeks or the cancer will spread and Defendant will die.
> On May 6, after the trial court pronounced the sentence in this case, Defendant was transported to the Montgomery County jail in Conroe, Texas. On May 9, 2019, Defendant was transported to a

9

Millenium Physicians office in Houston, Texas to receive the prescribed treatment for his cancer. Defendant received his prescribed cancer treatment and is now required to receive his next treatment thirty days after his most recent treatment, which would fall on June 8, 2019. *See attached exhibit B.*

After being transported to the Texas Department of Criminal Justice, Defendant was evaluated by a medical doctor. Defendant's medical records indicated the immunotherapy drug, Opdivo, must be administered to treat his cancer. Defendant was informed by the doctor that he did not believe that Defendant would be treated with Opdivo.

In Ward's affidavit, attached to the motion as Exhibit B, he stated in relevant part:

On May 6, 2019, I was sentenced to fifteen years in the Texas Department of Criminal Justice. As of that date I had been receiving treatment for stage IV cancer since being diagnosed in February of 2015. Since November of 2015, under the care of my oncologist, Dr. Moshen Arani, my cancer treatment has included the administration of the immunotherapy drug Opdivo every two weeks. I have received cancer treatment with Opdivo because it has been effective and essential in preventing my lung cancer from growing and spreading to the rest of my body.

From the beginning of my incarceration in the Montgomery County jail on May 6, 2019 until the date of this affidavit I have received the Opdivo treatment on May 9th and my next treatment is due June 9th. It is my belief, based on the advice of Dr. Arani, that if I do not receive this cancer treatment my cancer will continue to grow and spread through my body and this will lead to my death.

Ward's motion requested a hearing "[b]ecause the matters set forth in this motion and contained in the attached affidavit raise matters not determinable from the record[.]" On appeal, Ward argues that "holding a hearing on the grounds raised in the motion for new trial would satisfactorily develop the record to determine whether the Appellant is receiving his cancer treatment and therefore address whether his sentence violates the prohibition against cruel and unusual punishment."

10

Appellate courts review a trial court's denial of a defendant's request for a hearing on a motion for new trial using an abuse-of-discretion standard. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). Because a trial court exercises discretion in deciding whether a hearing is necessary on the matters a defendant raises in his motion seeking a new trial, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id*. (citing *State v. Gonzalez*, 855 S.W.2d 692, 695 n.4, 696 (Tex. Crim. App. 1993)).

"Evidence which is merely *cumulative* will rarely be judged by trial or appellate courts to be of such weight as likely to bring about a different result." *Kennerson v. State*, 984 S.W.2d 705, 708 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (emphasis in original). The trial court could have reasonably concluded that the motion and attached affidavit reflected that the testimony that Ward desired to present in another punishment hearing would be cumulative of testimony the trial court had already considered and that the matters raised were determinable from the record. Because we cannot say the trial court's denial of a hearing on Ward's motion for new trial on punishment was outside the zone of reasonable disagreement, the trial court did not abuse its discretion in denying the hearing and the motion and reversal for a new punishment hearing is not required. *See Smith*, 286 S.W.3d at 339. Issue two is overruled.

11

Having overruled all of Ward's appellate issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 21, 2020
Opinion Delivered December 30, 2020
Do Not Publish

Before Kreger, Horton and Johnson, JJ.